UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X   Case No.

SASIKALA GOPALAN,

                            Plaintiff,

               - against -

THE NEW YORK TIMES COMPANY, and
WIRECUTTER, INC.,

                           Defendants.

**COMPLAINT**

PLAINTIFF DEMANDS A TRIAL BY JURY

------------------------------------------------------------------X

      Plaintiff, SASIKALA GOPALAN, by and through her attorneys, White, Rose & Hilferty, P.C., hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 *et seq*. ("New Jersey LAD") and seeks damages to redress the injuries she has suffered as a result of being discriminated against by her employers due to her race (Asian), national origin (Indian), sex (female), as well as having suffered unlawful retaliation.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) as it is a judicial district in the State in which the unlawful employment practice is alleged to have been

committed and it is in the judicial district in which the employment records relevant to such practice are maintained and administered.

## PROCEDURAL PREREQUISITES

5. Plaintiff has filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission (the "EEOC").

6. On July 1, 2025, Plaintiff received a Notice of Right to Sue (dated the same day).[1]

7. This action was commenced within 90 days of receipt of said Notice of Right to Sue issued on July 1, 2025.

## PARTIES

8. At all times relevant, Plaintiff SASIKALA GOPALAN ("Plaintiff") was and is a resident of the State of New Jersey.

9. At all times relevant, Defendant The New York Times Company ("Defendant NYT") was and is a domestic business corporation, duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 620 8th Ave., New York, NY 10018.

10. At all times relevant, Defendant Wirecutter, Inc. ("Defendant Wirecutter") was and is a foreign business corporation, duly existing pursuant to, and by virtue of, the laws of the State of Delaware, with its principal place of business located at 620 8th Ave., New York, NY 10018.

11. At all times relevant, Defendants NYT and Wirecutter, individually and together, lawfully conducted business within the State of New York. Further, upon information and

---

[1] Plaintiff's EEOC charge was filed against The New York Times Company solely. Following her termination of employment (discussed below), Plaintiff has since filed a separate charge against both The New York Times Company and Wirecutter, Inc., and has requested for issuance of a Notice of Right to Sue. As of the date of this filing, the Notice has not yet been issued by the EEOC.

belief, Defendant NYT acquired Defendant Wirecutter in or around 2016 and as such, Defendant NYT is Defendant Wirecutter's parent corporation.

12. Defendant NYT and Defendant Wirecutter shall be referred to herein together as "Defendants."

## MATERIAL FACTS

13. Plaintiff's race is Asian, her national origin is Indian and her sex is female.

14. In or around October 2021, Plaintiff was hired by Defendants as an "Engineering Manager" for Defendant Wirecutter. She commenced employment that same month.

15. Plaintiff's decision to join Defendants was largely based on the assertions and promises of the person who interviewed her—to wit, a person named Erik Erickson ("Erickson")—who advised and guaranteed Plaintiff in her interview that he would personally focus on her career growth, discuss with her her career lattice periodically, and emphasized that women of color are given opportunities to succeed and grow within Defendant Wirecutter, promises which enticed Plaintiff to accept the job offer.

16. Notably, at all times, Erickson, who is a Caucasian male, was Plaintiff's direct supervisor and held supervisory authority over Plaintiff in that he had the power to directly affect the material terms and conditions of Plaintiff's employment as well as direct her daily work activities.

17. At all times relevant, throughout Plaintiff's employment, she worked remotely from her home in Edison, New Jersey. Throughout her employment, here and there, Plaintiff attended in-person meetings in New York City at Defendants' headquarters in Manhattan.

18. Throughout her employment, Plaintiff performed her work in an overall good manner and generally received praise for her contributions.

19. In or around February 2022, some four or so months after Plaintiff began employment with Defendants, during a one-on-one meeting with Erickson, Plaintiff raised the topic of her career growth and mentioned that she had come to learn that he (Erickson) had openly advocated for a Caucasian male (a person named Tim Moore ("Moore")) for a position to which she believed he (Moore) wasn't qualified. She also said that she noticed Erickson advocating for Moore but not for her. The purpose for which she brought this up was to highlight that it seemed unfair in light of what he (Erickson) had told Plaintiff in her interview.

20. However, in response to Plaintiff raising this, Erickson raised his voice with Plaintiff (intending to shut her down and effectively accomplishing that goal) and dismissed her insinuation of unfairness.

21. Thereafter, in late 2022, Plaintiff spoke with a person named Natasha Krasnov ("Krasnov")—who held the position of VP of engineering for Defendant Wirecutter and who was Erickson's manager—and advised that Erickson touted opportunities for women of color but that she wasn't actually seeing it in practice. She explained that Erickson told her that he'd discuss her career lattice periodically, however, they hadn't had any targeted conversations and there did not seem to be any clear plan.

22. In or around early 2023, Plaintiff again had occasion to speak with Erickson on the topic of him advocating for Caucasian men but not for her as a woman of color as promised. By way of background, around this time, Plaintiff came to learn that Moore hadn't been accepted into the role for which Erickson had been advocating for him, but that Erickson had continued to advocate for him even thereafter, namely for a different role within Defendant Wirecutter. Plaintiff asked why he (Erickson) wasn't advocating for her and

4

again inquired about her career path. Erickson responded by again raising his voice towards her, shutting her down and dismissing her inquiry.

23. Notably also, when Plaintiff was hired, Moore held the position of a software engineer (and was under the broader leadership of Erickson). In or around January 2023, Moore was elevated to the position of engineering manager, a role which was on the same level as Plaintiff. Upon this elevation, Moore reported to Erickson directly. However, in the engineering manager role, Moore had significantly more responsibilities and oversaw a much larger team than Plaintiff (even despite not having as much management experience as Plaintiff).

24. Thereafter, in early 2024, an issue developed at work surrounding the QA (Quality Assurance) role and conflicts which had arisen with it, namely that teams weren't aligned in goals and execution.

25. On February 7, 2024, management held a "safe space" meeting to discuss this QA project and the issues that had developed surrounding it. It was communicated explicitly that upon the conclusion of this meeting, the issues regarding the QA project were not to be further discussed. Nevertheless, after this meeting, Plaintiff had a one-on-one with Erickson during which he brought up the QA meeting and said that in the meeting, Plaintiff should have thanked Moore as well as another Caucasian male named Allen Tingley ("Tingley") and given them more credit for the support regarding the QA initiative. Plaintiff responded by telling Erickson that they hadn't done anything in support and she also provided examples. However, in response, Erickson again raised his voice, shut her down and dismissed her point of view.

26. Notably, with respect to Tingley, when Plaintiff was hired, Tingley held the role of an

engineering manager and was thereafter promoted to the position of senior engineering manager around September 2022. With respect to Tingley, throughout her employment, Plaintiff noticed that Erickson held a favoritism towards Tingley. On one particular occasion, Tingley was very aggressive towards Plaintiff and another staff member, which Plaintiff raised with Erickson. However, rather than take Plaintiff's complaint seriously, he replied, "if you know Allen's personality, you can deal with it."

27. Accordingly, Plaintiff observed Erickson openly advocating for two Caucasian male colleagues, both of whom received promotions during Plaintiff's employment, yet she was not being afforded the same opportunities or treated in the same way as these two individuals, especially given that Erickson guaranteed Plaintiff in her interview that he would personally focus on her career growth and discuss with her her career lattice periodically (within the context that women of color are given opportunities for growth).

28. On February 12, 2024, Plaintiff, being concerned about the violation of the "safe space" directive and criticism for not providing credit to male peer (who, in her mind, hadn't earned it), complained to Erickson via email. In it, she advised to Erickson: "Our [one-on-one] made me feel uncomfortable"; "While you [Erickson] mentioned that you were not trying to 'beat me up,' it did feel that way"; you "didn't allow me to express my perspective"; and, "When I attempt to give you context, you seem to interpret that as me pushing back. I would like to kindly request that you allow me to explain my perspective." Erickson did not reply to this email.

29. Approximately ten days later—on or about February 22, 2024—Erickson forwarded Plaintiff's 2023 year-end performance review to Plaintiff (which had been authored by him). The review, while carrying the rating of "Successful Year," nonetheless included

6

negative feedback such as: "I don't want to put you in a bubble and distance you from it. … I see symptoms lately that you are not able to take feedback right now." Plaintiff understood the "put you in a bubble" comment referred to Plaintiff putting forth her perspective about a level-playing field and unfairly painted her as someone who did not accept feedback.

30. Subsequently, Plaintiff submitted a formal rebuttal to Erickson's written year-end review with facts and her perspective to demonstrate that Erickson's negative performance feedback was unsubstantiated.

31. On February 28, 2024, Plaintiff met with Erickson for her 2023 year-end performance review meeting. During the review, Erickson criticized the rebuttal as "too lengthy," stating that "nobody writes a huge document in response to year-end feedback," and threatened her that if she did not accept the feedback as-is, "it's a big problem."

32. Following this meeting, Plaintiff reached out to Krasnov to inform her that her end-of-year performance review meeting with Erickson was not productive. Ultimately, Krasnov advised Plaintiff to reach out to HR if she felt the review was unfair, which Plaintiff did.

33. On March 1, 2024, Plaintiff reached out to HR and communicated with a person named Alyssa Casden ("Casden")—who held the position of HR Business Partner—regarding the negative performance review issued by Erickson and his overall treatment of her. During their conversation, Plaintiff detailed how, given Erickson's communication style, she couldn't have a two-way dialogue with Erickson and that he constantly dismissed her when they spoke. She also remarked that Erickson touted career growth for women of color, but this wasn't happening in practice. Casden advised that she (Casden) would relay the feedback to Krasnov and assured Plaintiff that things would improve.

34. Two days later—on March 3, 2024—Plaintiff submitted a formal complaint to HR Business Partner Lucy Kunkel ("Kunkel") regarding the ongoing discriminatory treatment to which she was subjected by Erickson. In it, she wrote: "[Erickson] doesn't allow me to have a two-way dialogue with any feedback"; "[Erickson] threatened me that it would be a huge concern if I didn't accept his feedback as is"; "He also raised his voice and cut me off when I tried to ask him for clarification"; "I got feedback that I missed giving kudos to two engineers amid a chaotic launch, whereas my male counterparts haven't given any kudos to my team"; and, "Finally, when [Erickson] recruited me he touted growth opportunities for women of color and said he would support me. But in reality, he gets upset and irritated when I bring up this topic. He uses a growth mindset as a way to push me off."

35. On May 8, 2024, Plaintiff reached back out to Kunkel via email seeking an update and CC'd the Chief Technology Officer Jason Sobel ("Sobel") as well as Krasnov. In that email, she reiterated that she had already filed a formal complaint and then stated: "I am writing to seek your intervention since I no longer feel safe in my role reporting to him. I feel like I'm in an abusive relationship where I cannot leave nor live with peace and dignity."

36. Two days later—on May 10, 2024—a person named Gina Woyicki ("Woyicki"), who held the position of Director, HR Business Partner—responded to Plaintiff's email to set up a meeting to discuss. (They ultimately spoke on May 16, 2024, as will be discussed below.)

37. Anecdotally, that same month (May 2024), Plaintiff approached Erickson about the viability of getting "stretch assignments." (For background, "stretch assignments" were

8

ones in which the tasks/ responsibilities went beyond one's current role and were intended to develop one's skills and talents for upward trajectory within the company.) However, when Plaintiff asked Erickson about these (and the viability of assignment), he curtly told her, "You're not going anywhere."

38. On May 12, 2024, Plaintiff emailed a person named Cliff Levy ("Levy")—who held the position of Deputy Publisher at Wirecutter and The Athletic, New York Times Company—and in it wrote: "I was encouraged by your speech at WC Connect, in which you noted that we should feel empowered to challenge our leadership. However, the reality I face is far from your vision at WC. I feel that some aspects of WC are still stuck in the fast-and-loose start-up culture and not fully integrated with NYT principles. I am forwarding an email thread seeking to address basic issues of fairness." Plaintiff also forwarded to Levy the email chain (which included her involving Kunkel, Sobel and Krasnov, as detailed above).

39. Plaintiff met with Woyicki on May 16, 2024. In their meeting, Plaintiff explained how she believed she was a victim of discrimination at the hands of Erickson and detailed how he routinely raised his voice towards her (and that he didn't treat Caucasian men in this manner), as well as how he consistently shut her down and dismissed her. At the conclusion of their meeting, Woyicki said she'd investigate it.

40. About a month later (i.e., in mid-June 2024), Plaintiff came to believe that nothing was going to be done by way of remedying the situation. As such, on June 13, 2024, Plaintiff caused a charge of discrimination to be filed on her behalf with the EEOC.

41. The following day—June 14, 2024—Woyicki informed Plaintiff that her investigation was complete. At this time, she also informed Plaintiff that her performance was up to

par and that Erickson would work with Plaintiff on her career growth (something which, anecdotally, never actually came to fruition).

42. On July 1, 2024, Plaintiff met with a woman named Melissa Yonelunas ("Yonelunas")—who held the title of Senior Manager, HR Business Partner—during which it was again confirmed that Plaintiff had been meeting performance expectations. Following this meeting, Yonelunas sent Plaintiff a summary email wherein she suggested that Plaintiff "[t]hink about what you might be able to do in order to change [Erickson's] perception."

43. Thereafter, on July 25, 2024, Plaintiff participated in a Google Meet video meeting with Erickson (and on that call was Krasnov). During their call, Erickson outlined certain performance issues that were to be included in a forthcoming performance improvement plan (a "PIP"). This came as a surprise to Plaintiff in light of her meeting with Yonelunas earlier that month. On that call, Erickson also threatened Plaintiff that she needed to improve her performance within 15 days, or she would be subjected to further disciplinary consequences. Following that call, Erickson sent Plaintiff the PIP as previewed.

44. Notably, the focus of the PIP was Quality Assurance which was not part of Plaintiff's 2024 goal. In fact, Krasnov was aware that the team had collectively agreed that they needed to re-group given that the direction Erickson was pushing for was leading to significant internal conflict across the teams. Krasnov was also aware that Plaintiff had proposed a new approach and stretch assignment titled "Quality Council" and had met with Plaintiff on July 23, 2024, in this regard.

45. Thereafter, on February 28, 2025, Plaintiff was issued a 2024 year-end performance review which had a rating of "Mixed." (Notably, this was a downward departure from her

2023 year-end review which had a rating of "Successful Year.") In it, it stated that "In H1 2024, you spent a considerable amount of time rebuffing and debating my constructive feedback," which "became a distraction to your team, and negatively affected your work performance."

46. On July 3, 2025, Plaintiff emailed Levy again. In this email, she updated him on the status of her charge having been filed with the EEOC (and informed him that a notice of right to sue had been issued on July 1, 2025). She also asked to have a "dialogue" with him and reiterated her interest in "working for Wirecutter and NYT."

47. Levy replied on July 8, 2025, largely dismissing her having reached out to him. Specifically, he stated:

As [Erickson] clearly said in your [2024 year-end] review, you received a "Mixed" rating because "you spent a considerable amount of time rebuffing and debating [his] constructive feedback aimed to help you grow. This reached a point where it became a distraction to your team, and negatively affected your work performance." That is precisely what you are doing now, once again re-raising the very same dissatisfaction with [Erickson] and [Krasnov's] prior feedback on issues that date back over a year.

He closed by writing, "[I]t is not acceptable that this matter remains unresolved, and I feel it is important that I write to you directly and transparently about where Wirecutter's leadership stands."

48. Following this communication with Levy, Plaintiff reached out to David Rubin ("Rubin")—a person who held the position of Chief Brand and Communications Officer and Publisher for Defendant Wirecutter. Rubin was also Levy's manager. They spoke on July 11, 2025, during which Plaintiff detailed the discrimination and retaliation she had been facing.

49. Following their conversation, Plaintiff sent Rubin a follow-up email. Notably, in her

11

correspondence (which was sent on July 17, 2025), Plaintiff provided Rubin with a document which detailed the background of the situation she was facing, namely, that she had not seen much of a change in Erickson's approach with her despite complaints to HR, that she had asked Krasnov to move away from Erickson fearing retaliation, and "[t]he fact that women of color reporting to [Erickson] have been compelled into filing EEOC complaints against [him] to feel heard."

50. On July 18, 2025, Rubin confirmed receipt of this correspondence and advised he'd "get back to [her] next week sometime." Rubin ultimately advised Plaintiff to reach out to HR, which Plaintiff again did.

51. Thereafter, on July 23, 2025, Plaintiff had a video call with Yonelunas during which she explained the discrimination and retaliation she had been caused to endure and emphasized that it had not been remedied. During their call, Yonelunas encouraged Plaintiff to accept a severance package. Plaintiff ultimately declined.

52. On August 8, 2025, Plaintiff's employment was terminated. During the Google Meet video call at which Plaintiff was fired (at which there were two other individuals present—Erickson and Yonelunas), Erickson told Plaintiff her job loss was purportedly due to her "performance."

53. Plaintiff felt offended, disturbed, and humiliated by the discriminatory harassment and disparate treatment she faced.

54. Plaintiff has been unlawfully discriminated against, retaliated against, humiliated, degraded, and belittled, and as a result, suffers loss of rights and emotional distress.

55. Defendants' actions and conduct were intentional and intended to harm Plaintiff.

56. As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded,

victimized, embarrassed, and emotionally distressed.

57. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails.

58. Defendants' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands punitive damages against Defendants.

<b><u>AS A FIRST CAUSE OF ACTION<br>FOR DISCRIMINATION UNDER TITLE VII<br>(Against Both Defendants, Individually and Together)</u></b>

59. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

60. Plaintiff was caused to suffer disparate treatment on account of her race, national origin and sex.

61. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e, *et seq.*, for relief based upon the unlawful employment practices of Defendants. Plaintiff complains of Defendants' violations of Title VII's prohibition against discrimination in employment.

62. Defendants, individually and together, engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e, *et seq.*, by discriminating against Plaintiff causing her to suffer damages.

<b><u>AS A SECOND CAUSE OF ACTION<br>FOR DISCRIMINATION UNDER NEW JERSEY LAD<br>(Against Both Defendants, Individually and Together)</u></b>

63. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

64. Plaintiff was caused to suffer disparate treatment on account of her race, national origin and sex.

65. New Jersey LAD § 10:5-12(a) sets forth in pertinent part as follows: "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: a) For an employer, because of the race … national origin … [or] sex … to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

66. Defendants, individually and together, engaged in unlawful employment practices prohibited by the New Jersey LAD by discriminating against Plaintiff causing her to suffer damages.

## AS A THIRD CAUSE OF ACTION
## FOR RETALIATION UNDER TITLE VII
## (Against Both Defendants, Individually and Together)

67. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

68. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

   (1) to ... discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

69. Defendants, individually and together, engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e, *et seq.*, by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

## AS A FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER NEW JERSEY LAD
## (Against Both Defendants, Individually and Together)

70. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

71. New Jersey LAD § 10:5-12(d) sets forth in pertinent part as follows: It shall be an unlawful employment practice "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has … filed a complaint, testified or assisted in any proceeding under this act …"

72. Defendants, individually and together, engaged in unlawful employment practices prohibited by New Jersey LAD § 10:5-12(d) by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

## JURY DEMAND

73. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII and the New Jersey LAD in that Defendants discriminated against Plaintiff causing her to suffer damages;

B. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII and the New Jersey LAD in that Defendants retaliated against Plaintiff causing her to suffer damages;

15

C. Awarding economic damages to Plaintiff resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such discriminatory employment practices;

D. Awarding Plaintiff compensatory damages for mental and emotional distress, pain and suffering and injury to her reputation in an amount to be proven;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
September 26, 2025

**WHITE, ROSE & HILFERTY, P.C.**

By: _____
 Casey Wolnowski, Esq.
*Attorneys for Plaintiff*
757 Third Avenue, 20th fl.
New York, NY 10017
Ph: (646) 350-0026
Email: cwolnowski@nycjobattorney.com


By: _/s/ *Michael P.Hilferty*_____
Michael P. Hilferty, Esq.
*Attorneys for Plaintiff*
757 Third Avenue, 20th fl.
New York, NY 10017
Ph: (646) 698-8990
Email: mph@nycjobattorney.com